THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JAMES SANDERS, Appellant.

Second Department, May 20, 1985

**APPEARANCES OF COUNSEL**

*William E. Hellerstein* (*David P. Friedman* of counsel), for appellant.

*Elizabeth Holtzman, District Attorney* (*Barbara D. Underwood, Roseann B. MacKechnie* and *Rosalyn H. Richter* of counsel), for respondent.

**OPINION OF THE COURT**

TITONE, J. P.

Defendant appeals from a judgment of the Supreme Court, Kings County, convicting him of manslaughter in the first degree and criminal possession of a weapon in the second degree, and imposing sentence. His basic contention is that the trial court erred in permitting one of the prosecutor's main witnesses to give testimony concerning the general appearance of the assailant, following a pretrial ruling which precluded the witness from making an in-court identification due to suggestive identification procedures. We conclude that such testimony was

proper, and, finding no merit to the remaining contentions, we affirm the judgment of conviction.

On January 23, 1980, at about 11:30 P.M., Arnold Cromer was shot in the head and killed. His body was found on the second-floor landing of the Brooklyn apartment building in which his girlfriend and defendant, James Sanders, resided.

Prior to the murder, Cromer, carrying groceries, arrived at the front door of the apartment building, intending to visit his girlfriend. He called to his girlfriend to open the door, and while waiting for her to do so, spotted a friend, Nelson Astacio, whom he asked to wait with him until his girlfriend did so.

According to the victim's girlfriend, when she exited her apartment in order to open the door, she saw the defendant standing in the hallway with a gun. He told her to return to her apartment and to stay there so as to avoid any "static". She followed the defendant's orders. Meanwhile, Cromer went around to the back of the building. After several unsuccessful attempts to get his girlfriend's attention, she finally heard him calling her. From a window, she told him to go away because there was a man with a gun in the building.

Cromer ran around to the front of the building, broke a small pane of glass in the front door with a stick he found on the ground. He dropped the stick and entered the building. Astacio followed Cromer momentarily, but turned to get the groceries Cromer had forgotten. When Astacio returned for the groceries, he heard a shot. He called out to Cromer and, receiving no response, Astacio looked through the broken pane of glass and saw a man standing on the staircase. Astacio was able to determine that the man was a dark-skinned black, with a moustache and goatee, who was wearing a black shirt, with silver writing on it, black pants, a stocking cap on his head and "[d]ark shades". The man, however, was not wearing a coat or jacket. At that point, the man turned the gun at Astacio; Astacio fled.

In contrast, the defendant claimed that a shot rang out after which he heard what sounded like several people running up the stairs. Fearing it was Cromer, who defendant stated threatened him previously, he ran out of the building directly to the police station. Defendant also claimed that he passed several black teen-agers whom he did not recognize in the hallway and stairwell. Strangely, neither Astacio nor Cromer's girlfriend saw these individuals.

Upon arrival at the police station, defendant was observed dressed in a black shirt, black pants, and wearing a stocking cap

on his head. He had a moustache and goatee and wore neither a jacket nor a coat. After reporting the shooting, the defendant returned to the building accompanied by the police. Cromer was found dead.

Later that evening the two witnesses, Astacio and Cromer's girlfriend, were shown photographs, including one of the defendant, taken that same day. Astacio was unable to identify any of the subjects in the photographs as being the man he saw on the staircase with the gun. In an emotional outburst, Cromer's girlfriend clearly and unequivocally pointed out the photograph that depicted the defendant. Subsequently, the two witnesses were seated where the defendant was being detained. The two then engaged in conversation regarding defendant's role in the shooting. Following this discussion, the witnesses observed a lineup. Astacio subsequently identified the defendant as the man he saw with the gun on the staircase at the time of the shooting.

Prior to trial, defendant sought to suppress any identification testimony offered by Astacio. Justice Pizzuto, who presided at the suppression hearing and the trial, granted the motion, finding that the "procedures utilized by [the detective] were at the very least indirectly responsible for creating a suggestive atmosphere for identifications" and that there was no independent source for the identification. At trial, however, Justice Pizzuto permitted Astacio to testify that he saw a black man, with a moustache and goatee like defendant's, on the staircase holding a gun and that the man was wearing black pants, a black shirt with some silver writing on it, dark sunglasses, a stocking cap on his head, but had no coat or jacket. Astacio was not, however, permitted to state that the defendant was the person he saw on the staircase.

This testimony did not contravene the suppression ruling. Justice Pizzuto did not find at the pretrial hearing that Astacio's testimony was unreliable for all purposes. He simply precluded Astacio from identifying the defendant as the person on the staircase. The accuracy of the description was a factual question for the jury to assess and could not be determined by the court as a matter of law on the motion to suppress (*see, People v Herriot,* 110 AD2d 851 [Apr. 22, 1985]; *People v Bigelow,* 106 AD2d 448, 449-450; *People v Finley,* 104 AD2d 450, 451, *adhered to on rearg* 107 AD2d 709; *People v Dukes,* 97 AD2d 445, *lv denied* 61 NY2d 673; *People v Cannon,* 71 AD2d 924; *People v Balsano,* 51 AD2d 130, 132; *People v Hinds,* 40 AD2d 786). Thus, CPL 710.20 (6) is inapposite.

Like the United States Court of Appeals for the Fourth Circuit, the only court to explicitly pass on the issue as far as we are able to ascertain, we think that the line between "resemblance" and "identification" testimony, though "thin", is "a line worth drawing" (*Patler v Slayton,* 503 F2d 472, 476; *but see, United States v Brooks,* 449 F2d 1077, 1083). As the Fourth Circuit explained, "[a]lthough the failure of a witness to make a positive, in-court identification cannot be used by the state to insulate its improper identification procedures from scrutiny, it is entirely possible, we think, for a skilled trial judge to separate the tainted matter from what the witness actually observed at the scene of the crime and thus avoid an unnecessarily blunt application of the exclusionary rule of *Wade* [388 US 218] or *Gilbert* [388 US 263]" (*Patler v Slayton, supra,* at p 476).

That is exactly what occurred here. Justice Pizzuto took pains to insure that the line was not crossed. Astacio was permitted to give "resemblance" testimony, not "identification" testimony. Indeed, a review of the record indicates that Astacio gave a description of the assailant to the investigating officer prior to the suggestive photographic identification procedure. Hence, that suggestive procedure did not taint the description (*cf. Nix v Williams,* 467 US __, 104 S Ct 2501; *People v Ramos,* 42 NY2d 834; *People v Cobenais,* 39 NY2d 968).

Although the prosecutor inadvertently stated in his opening remarks that Astacio would identify the defendant, Justice Pizzuto immediately sustained an objection and gave a curative instruction. More important, the prosecutor immediately retracted the statement and told the jury "there are no eyewitness. Nelson Astacio will not come in to this courtroom and identify James Sanders, the defendant * * * The only thing Nelson Astacio will do is tell you that he saw a man dressed in black with a gun". Any possible prejudice to the defendant was thereby alleviated (*see, People v Santiago,* 52 NY2d 865; *People v Young,* 48 NY2d 995; *People v Arce,* 42 NY2d 179; *People v Lopez,* 100 AD2d 555, 556).

The other issues raised by the defendant have been considered and have been found to be without merit. Accordingly, the judgment should be affirmed.

WEINSTEIN, J. (dissenting). Notwithstanding the majority's attempt to characterize witness Astacio's testimony as "resemblance" rather than "identification" testimony, I am of the view that defendant was deprived of a fair trial by the court's permitting Astacio to give a detailed description of the perpetrator after having suppressed that witness' pretrial and in-court identifications as totally unreliable (*see, People v Adams,* 53 NY2d

241). Without taking issue with the holding of the United States Court of Appeals for the Fourth Circuit that descriptive testimony by a suspect witness is less dangerous than his in-court identification of the defendant as the perpetrator (*see, Patler v Slayton,* 503 F2d 472, 476-477), it bears noting that the District of Columbia Circuit has found the exclusionary rule applicable to "resemblance" testimony inasmuch as a defendant's rights would be violated if such testimony had been obtained by means of an arrantly suggestive confrontation (*United States v Brooks,* 449 F2d 1077, 1083). Stated succinctly, an acceptance of the People's claim that Astacio was merely precluded from specifically naming defendant in court, while he was otherwise free to describe him in full detail, would vitiate the significance of the exclusionary rule set forth in *United States v Wade* (388 US 218) and *Gilbert v California* (388 US 263).

Courts are statutorily empowered to suppress or exclude improper identification testimony on the ground that it "[c]onsists of potential testimony regarding an observation of the defendant either at the time or place of the commission of the offense or upon some other occasion relevant to the case, which potential testimony would not be admissible upon the prospective trial of such charge owing to an improperly made previous identification of the defendant by the prospective witness" (CPL 710.20 [6]).

Despite the clear import of the statute, the trial court permitted witness Astacio to give the following descriptive testimony regarding his observation of the perpetrator: a dark-skinned black male with a gun, wearing black pants, no jacket, a black shirt with silver markings, a stocking cap and dark glasses, with a goatee and mustache slightly longer than that worn by the witness. Although Astacio was not permitted to directly testify that the perpetrator was in fact the defendant, no juror could reasonably have failed to comprehend that the person described was the defendant. For all essential purposes, Astacio's description of defendant was tantamount to an outright identification. This is particularly true in light of the improper comment made by the prosecutor in the course of his opening statement to the effect that Astacio had viewed defendant at the scene of the crime. Although the statement was subsequently retracted, it was likely to have left a lasting impression upon the minds of the jurors.

As per my reading of the record, there is no evidence that the detailed description of the perpetrator which Astacio gave at trial was given to the investigating detective before any sugges-

tive procedures were undertaken at the police station. Additionally, there is a very strong likelihood that Astacio embellished his description, making it accord more closely with defendant's actual appearance, when it became apparent to him that the defendant had been positively identified as the perpetrator.

On this record, it cannot be said that there is no reasonable possibility that the descriptive testimony of witness Astacio did not contribute to defendant's conviction. Consequently, the constitutional error involved in its admission cannot be deemed harmless beyond a reasonable doubt (*People v Crimmins,* 36 NY2d 230), and the matter should be remitted to Criminal Term for a new trial.

MANGANO and KUNZEMAN, JJ., concur with TITONE, J. P.; WEINSTEIN, J., dissents and votes to reverse the judgment and order a new trial, with an opinion.

Judgment of the Supreme Court, Kings County, rendered August 23, 1982, affirmed.